Case No. 15-7049 United States v. Israel Anthony Oliver and Anthony Oliver Appellant v. Philip Morris USA Inc. of Virginia Corporation, formerly known as Philip Morris Incorporated. Mr. Bello, for the Appellant. Mr. Paz, for the Athlete. Good morning. Good morning. Why don't we let everybody get settled? Thank you. Good morning. Good morning. I'm David Golub, and I represent the Relator, Anthony Oliver, in this appeal. When this case was before the Court the first time, this Court specifically articulated the test to be applied for determining whether there was public disclosure of Mr. Oliver's allegations. Using the traditional Springfield Terminal X plus Y equals Z test, the Court said the X was public disclosure of price disparities between the prices charged to government and the prices charged to the private consumers. And the Y, the Court said, was there a public disclosure of false certifications of compliance with the MFCs. The Court said in order for there to be public disclosure there had to be proof of both of those points. One, the price disparity. Two, false certifications of compliance with the MFCs. And the Court went further and explained that the Y component was comprised of two prongs. The first prong was the existence of the MFCs themselves, which establishes the fact that there was a certification at issue. And the second prong of the Y component was that there were false certifications. And the Court dealt with those two prongs on the first page of its decision, in the first paragraph of its decision, where the Court said, and this is a quote, Neither the contract term obligating Philip Morris to provide the government with most favored customer pricing nor Philip Morris' fraudulent certifications that it complied was publicly disclosed. Accordingly, we vacate the District Court's decision. So your position is that it was error, legal error for the District Court to conclude that given what had been publicly disclosed, an implied false certification, an inference of an implied false certification was appropriate? Yes, the District Court could make a finding that there was a certification because the MFCs require a certification. But what the District Court did not have any evidence of, did not have any public disclosure of, was that there was a false certification. And that is what the definition of the Y was in this Court's first opinion, evidence of a false certification of compliance. How do you define false certification, just so we're all clear? A false certification is, under the False Claims Act, a certification that Philip Morris complied with the price warranties in the MFCs, knowing that it was not complying with the warranties. And knowing is defined under the statute to be either intentional or with willful blindness or with reckless disregard. But there had to be something before the Court to establish falsity. And what this Court said in its first decision, this was the argument in the first decision before the Court, does the Iceland memo have anything in it to support a finding of falsity? And the Court addressed that in Part 3B of its decision. All right, but then on remand, the District Court says we have evidence of price disparity. See the Iceland memo. We have evidence that the MFCs exist and that they were publicly available. And the essence of your complaint, said the District Court, is disclosed because of the inference that arises from the continuation of sales. Well, the inference that the District Court drew was an inference of certification. You can make an inference of certification. No, she went further. The District Court went further. And what she said was, you can draw an inference of wrongdoing from the Iceland memo. And she used the familiar, because the government investigator would be alerted to the likelihood of wrongdoing. And why not? This is coupled with knowledge of the MFC. Yes, but this Court specifically rejected any finding that the Iceland memo would give rise to a knowledge of fraud in its first decision. Standing alone. Not just standing alone. What it said in 3B was, and the argument that was made before was, well, the fact that there were complaints, the fact that there were complaints made would have alerted the investigator. The Court rejected that in 3B. The mere fact that the exchanges inquired or even complained about pricing does not amount to a public disclosure of facts supporting the elements of a claim of fraud. Contrary to Philip Morris' assertions, the Iceland memo did not publicly disclose the allegedly fraudulent aspect of the prices Philip Morris charged the exchanges. I don't see the problem that you're raising. The problem that I'm raising is not every price disparity is unlawful. Not every price disparity is fraudulent. Not every price disparity is a false certification. Your client's theory is that there's fraud lying in the combination of price disparity plus the MFC, right? The client's theory here, Mr. Oliver's theory, is that there was deliberate overpricing by including the monies to fund domestic surcharges. I have to say that argument, which occurs throughout the briefing, completely eludes me. How is there anything like fraud in charging what the market will bear, assuming there's nothing else? It's fraud because there are two prices charged to similarly situated customers. You're going back to the MFC, right? Yes. The MFC says you have to charge the government the best price you give similarly situated customers for the same product. What Philip Morris is alleged to have done, and I don't think they deny that they did this. They just say it was legal. What Philip Morris is alleged to have done is to price cigarettes to private distributors without including amounts to cover domestic surcharges, price the same cigarettes, identical cigarettes in the same markets to the government with including $6.60 to cover the MSA surcharge and the TTPP surcharge. You've completely lost me because I thought that the whole theory of your case was the combination of the price differential plus the MFC spelled fraud or at least enough to set an investigator on the trail of fraud. No, that I... No? Something else? Well, Judge Williams, the claim here is, and what the complaint alleges is, that there was a knowing and intentional false certification. That's paragraph 31 and 36 of the complaint. And the knowing and intentional false certification is, the claim is, that Philip Morris used its affiliates to do fraudulent transactions to violate the MFCs. They had an obligation to give the government the best price. What they did was they sold from Philip Morris, the parent company, directly to the government at one price. They then used their affiliates. They sold at a low price to their affiliates. The affiliates then turned around and resold at a low price to a similarly situated private duty free customer. And the allegation here is that that was a knowing and intentional way of circumventing the MFCs. The difference between what's in the complaint and what's in the Iceland memo is, the Iceland memo says, this is perfectly legal. As we've explained... That's a legal conclusion, but the fact of differential prices is acknowledged, right? Yes, but this... In fact, it's the whole issue of the memo. The fact that differential prices doesn't give rise to any wrongdoing. Differential pricing, and what we're saying, what that memo says is, there's nothing wrong here. What the complaint says is, there is something wrong here because it was a scheme to avoid the MFC obligations by not giving the same prices to the government. What the memo says is, the Iceland memo says, there's this reason for it, a business reason having to do with the Surgeon General requirements. We explain that, and it says at the bottom, issue resolved. What the complaint says is, that's not the reason. That's not the reason for the price disparity. This was a sham to charge the government $6.60, whatever the differential is. It turns out it's more than $6.60 in the one example we give for American Samoa. But it's a sham to evade the MFC requirements. And in order for the Iceland memo, either alone or in combination with facially neutral, the MFC provisions are facially neutral, there has to be something in the Iceland memo that gives rise to a likelihood of wrongdoing, or as was said in Springfield Terminal, clear and substantial evidence of wrongdoing. Or evidence that would allow a government to begin a prosecution. An investigation. There has to be a likelihood. It's not a possible suspicion. Here, what you have in that agreement, in the Iceland memo, is, yes, there's a price disparity. It's perfectly legitimate. The issue is resolved. Where is there anything in the Iceland memo that supports a finding of any wrongdoing, that would allow you to say any wrongdoing? As I understand it, it's a legal principle outside the case, outside the factual disputes in this case. You're relying on a legal principle that essentially the MSA and the other charge equally do not apply to either of these. No. It's true that they don't apply. What we're claiming, Judge, is that they charge one price to the government, they charge one price to private duty free customers, and they justified the price to the government by saying it was to cover the amounts of those surcharges. It doesn't make any difference why they justified it. They knew, this is what the complaint alleges, they knew that they were charging different prices, they knew it was a violation of the MFC, and they knew that they were falsely certifying compliance. And all the Iceland memo says is there's a price disparity. How does that give rise to any basis for a finding of wrongdoing? This is an internal memo from one Philip Morris executive to another saying we got this phone call, we resolved it, we told them that it was because of the requirement of the Surgeon General's requirements that there's different prices. Issue resolved. There has to be... There's no clues to what resolved the issue. Yes, we don't know that, but that's not on the relator to establish. The significance of it is that Philip Morris is arguing that that internal memo would have alerted a government, would have provided a basis for prosecution, or would have alerted to a likelihood of wrongdoing. That's what they have to establish, and that is exactly what this court said the first time around didn't happen. So the government, that's right, looking only at that memo. So you know that Philip Morris is charging two different prices, and that the government's paying more for cigarettes than a duty-free cigarette. Yes. And you know that there's an obligation to give the government the most favored customer. Yes, if there's no reason to justify the price differential. Whether there's a reason or not depends on something completely outside the colloquies within Philip Morris, and also something outside the mind of Mr. Oliver. It depends on what the law is. And I haven't seen anything, any of the cases that requires that there be some certification of some, of why a possible claim of distinction is invalid under the law. Because what the cases make, the cases, every case says exactly what this court said about the why in the first appeal, that there has to be some basis in an FCA claim for a finding of falsity. And where in the Iceland memo is there anything to support any wrongdoing, any falsity? Even if you add the certification. That's a kind of strange argument coming from you, where the whole thrust of your case has been that it's obvious that there's no difference between these types of sales, that it's obvious that the MSA charge doesn't apply to sales to the government, essentially what used to be called post-exchanges. So it just seems terribly strange for you to say that that's completely buried, and the reader of the Iceland memo would never think of the possibility. Well, but you have objective evidence of that. The objective evidence is what the Iceland memo says is we've gotten inquiries from government personnel, we've explained this to them. If this was so suspicious, if there was a hint of wrongdoing, those inquiries would have resulted in some investigation. Those inquiries would have resulted in somebody saying this doesn't make any sense. And the issue here is not, of course we take the position that there is a fraudulent scheme here. The issue is what did that memo, written eight years earlier than the filing of Mr. Oliver's complaint, convey to anybody reading it? And it didn't convey anything about any criminal activity or any fraud or any falsehood. Could I ask about something related to Mr. Oliver as an original source? Yes. In the original set of memos before the district court, on that Mr. Oliver pointed to a November 16, 2007 email which he had sent, and which says that the overpayments doesn't say over with respect to what or anything. And it says also that Mr. Oliver talked with all kinds of high brass and made the same point to them. Then in the 2015 declaration, that blossoms extraordinarily. And there we have allusions to the Samoa Guam problem. We have the reference to the MFC. Everything blossoms extraordinarily. So the case that Mr. Oliver is now, post-2015, saying he communicated to the government, is full-fledged as opposed to, I have to say, seems to be a meaningless assertion over payments in that November 2007 email. Well, we fleshed it out when we went back when they re-raised the issue. I mean, there's no dispute that Mr. Oliver met with the top officials of NEXCOM, the top officials of AFIS. He met with Rear Admiral Bianchi, the CEO of NEXCOM. He met with the COO, Michael Howard, of AFIS. He met with the Director and Secretariat of AFIS. And he explained to them the claim he was making about the inclusion of amounts for purported covering surcharges. And there's no dispute that he did that. There's no dispute that he called the DOD hotline. We basically, when they re-raised their motion after the first decision, we went in to present a more full explanation of what Mr. Oliver did. And on that point, it's clear that he brought this to the attention of the government. The question is, what is this? He brought his claim that Philip Morris was falsely overcharging, was charging the government more based upon purported amounts needed to cover surcharges than it was charging private duty free companies. Is that clear in the November 07 memo? Well, the November 07 email just makes an allegation of overcharging and fraud. What we did was we put in what his discussions were with Rear Admiral Bianchi, what his discussions were with the AFIS executives, and we put in how he went about verifying what he knew from the beginning. And the significance of that is, even if there were public disclosure, as an original source, he's entitled and can proceed with his action if he has direct and independent evidence of even one vital ingredient, one element of the case. The district court denied him original source status because it said he got it all from third parties, making reference to the paragraph where he said he went and verified. But he knew from day one when he talked with Maloney in 2007, the Nexcom buyer, he knew that when Maloney told him, Maloney said to him, Philip Morris is including charges to cover the amount of the MSA surcharge in his pricing, he said to Maloney on that day, before he did any verification, he said to Maloney, that should not be included. That is not included in normal pricing. He was someone who was in the market. He was familiar with market pricing. He himself paid the MSA and TTP surcharges. He had pricing in domestic. He had pricing in international. And he told Maloney that. Maloney said, wow, they've been pulling the wool over my eyes. And then he went and verified it. The district court denied him original source status, not because it didn't believe what he was saying, but because he went and verified it. And she said, oh, well, everything he knew came from third parties. When he told Maloney, this is an overcharge. He hadn't talked to any third parties. He was a conversation with Maloney based upon his personal experience as someone in the market participant. And so the original source status is something that is an independent ground to allow him to go forward with the lawsuit. All right. I'll give you some time on rebuttal. Thank you very much. Good morning. Good morning, Your Honor, and may it please the court. Elizabeth Pérez, former defendant at the Lee Philip Morris USA. I think the theory of fraud here is exactly as the court described it. It's that Philip Morris was telling the government one thing and, in fact, doing something else, which revealed that the statement to the government was false. Namely, the theory is that one can imply from the most favored customer provisions a certification that Philip Morris was giving the military the best price for the products. And then there was a price disparity that showed that, or you could infer that might be false, because two corporate affiliates were getting a better price. That's the theory. And we believe the district court correctly in this round applied the disclosure bar because this court's cases say that the bar applies where the fraud that were later alleges, the essential elements of the fraud he alleges were in the public domain prior to the suit. And so when you look at the joint appendix, pages 21 and 22, those are the pages of his complaint where he describes this theory and he says the fraud is there's a most favored customer certification to the government, and then there's some pricing activity, namely giving two particular corporate affiliates, duty-free and international, a better price than the government. So counsel relies heavily on this court's opinion in Oliver I in defining the why in this XYZ formula. Are you taking issue with that? No, Your Honor, not at all. I think the issue is, as the court described here today, in that opinion, the court was focused on whether the Iceland memo standing alone was enough to trigger the bar because the court concluded that the other piece was not sufficiently disclosed on the record of evidence at that time. On remand we supplemented that, so now we have the two pieces before the court. So I agree that was the holding, but there's this discussion by the court describing what it thought was needed in order to reach the Z conclusion, and everybody agrees as to the X. It's this Y characterization that seems to be at issue, that the fact that there's a most favored customer provision doesn't tell you anything because that simply says, subject to all kinds of qualifications, your client's obligated to give the government the most favored customer. So you don't know at that point, if I understand the argument, whether or not there's any problem or not. Well, two things, Your Honor. I think with the two pieces in front of you, meaning the price disparity and the most favored customer, you can infer the fraud because what you have in front of you then is a most favored customer provision from which you can infer that Philip Morris was telling the government, impliedly certifying that he was getting the best price. All right, so let me just push you on that. Sure. The argument in part might be that the most favored customer provision does not obligate Philip Morris to give exactly the same price to the government as it might give to someone else. That there are other factors that could work into what is legitimately a most favored customer price, but that price differs from what Philip Morris may be charging other customers. So then you're into this, well, are the customers similarly situated, et cetera. What's your response there? Twofold, Your Honor. Number one is the question for the bar, let's assume that we're just looking at these disclosures, is could one investigator infer a fraud? I think the answer is you're certifying this most favored customer. You've got a price over here that may or may not violate that. You could investigate it. That's appeared from these disclosures. But the more important and, in fact, critical point here is that under this Court's cases, the bar measures what's in the relator's complaint against what's in the public domain. And his complaint, again, this is paragraphs 25 to 29, appendix 21 and 22, he alleges no more than the two pieces that we just described and that were in the public domain. And that is why the district court correctly on this round found that the fraud relator alleges, to use this Court's formulation of staples, was in the public domain now that we have the record establishing the two pieces. But one thing I'm not, I guess, understanding about your argument is that in any government contract, there could be evidence that someone comes across that the contractor may not be in compliance with the contract. That doesn't necessarily put you on notice of fraud. And it seems that that's what you're arguing here. Well, but again, Your Honor, it's not what we're arguing. The test for the bar is simply what is the relator alleging is the fraud in his complaint and are the essential elements of what he describes as a fraud publicly disclosed. And that test is met here because, as Your Honor notes, we don't believe that what he's pled in his complaint actually amounts to or pleads a fraud, but that's beside the point for jurisdiction, which is the issue here today. All we look at is what is he saying the fraud is, what are the elements. And he's saying there's a most fatal customer certification that the court can infer is false because we appear to be charging someone else a better price. That's, you know, paragraphs 25 to 29 of his complaint. And that's exactly what was in the public domain. He's not adding anything to those publicly disclosed elements. And if we take a step back for what this bar is supposed to do, it's supposed to judge or test whether a key TAM action that the government has declined to join after an investigation should nonetheless go forward because the relator is adding something about a potential fraud that might otherwise have gone undetected or might reveal something new that's not in the public domain, and that simply is not the case here. Is there any legal significance to the fact that the government didn't join? Have we ever held that that has any significance in how we view this matter? I don't know if the court has held that. But I think statistically, and we had a site on this in our briefs, statistically it's like 90-some percent of non-intervened key TAM cases are not permitted to proceed, and that's in part because the relator purports to be standing in the government's shoes and prosecuting a claim of potential fraud in the government's name. Now, certainly there are some cases where a key TAM action can proceed where the government declines to intervene, and even when some of the elements of the fraud are in the public domain, and that's where you satisfy the original source requirement. But that has some very specific trappings and requirements that we would submit are not met here for the reasons in our papers, and I think the district court carefully considered below, and she agreed, including after considering the new and far more robust declaration that Mr. Oliver submitted. Yeah, I have two questions about that. One is it doesn't seem to me that your brief fully addresses the more robust claims in the 2015 declaration, which there it's blossomed into the whole thing, at least what I take to be now the whole thing, namely this is at page 453 in particular, where we have not merely the Methodist price differential, but the assertion as to what the cause of the price differential is, and then in addition is thrown in the MFC. So assuming that's taken as correct, the flaw in terms of original source is what? There are three, Your Honor, and they're a matter of timing and quality, not just quantity on the declaration. The first is the operative complaint does not plead original source, which the Supreme Court said at Rockville is a problem, but even if we go on to consider the declaration at appendix 453 and onward. I didn't quite read Rockville to say quite as much as you're saying, but I get your point. So it's conceded it's not, but let's go with the district court's view and say let's take everything he's put in the record and let's consider it on the merits, and let's do that starting at appendix 453. He starts out with what this court's opinion in Findley described as some conclusions. He says I believe there was a fraud. I had a suspicion. We've seen many relators do that who've been jurisdictionally barred. And then he goes on to say, and this is really important, it's paragraph 13 of his declaration at pages 454 to 55 of the appendix. He concedes that the only specific example of the disparate pricing that he says shows the certification to be false, this Samoa versus Guam disparity, is one he discovered after he filed this lawsuit in 2008. So the original source cases are clear that even if there is direct knowledge and a specific example, it has to be uncovered and brought to the government's attention before the lawsuit's filed. So that's not the case here. And then further and critically, this court's precedents say that the relators acknowledge of the substantive allegation of fraud. I want to go back a moment because your reading may well be correct, but we have paragraph 10 in which it's a fairly elaborate presentation of what he claims to have said to Admiral Bianchi and others. And then we have paragraph 13. And I take it you're saying the only reasonable reading of that is that the aspects of paragraph 10 that depend on information in paragraph 13 must be, in fact, after-discovered information. Is that right or what? I think that's the most reasonable reading, if not the only. But the other thing I'd say, and I appreciate your Honor raising paragraph 10, it was going to go directly to the point I was about to make about the cases, which is that the information in this declaration, including paragraph 10, has to be direct and independent of third-party sources, meaning it has to be firsthand. And the district court correctly applied those cases to say what he's really describing here is his learning things from third-party sources that were not unique to him. It wasn't direct or independent. My reflection is part of your brief accepts the proposition that the relator can do at least some research, and I take it research other than plowing through documents. Indeed, Your Honor. We agree completely and we don't quarrel with the fact that a relator who has what you need in the first place, which is some direct and independent knowledge, factual knowledge of your own, you are then free to go investigate and augment it. But you have to have the first step, which is the relator personally has to have direct and independent knowledge of the fraud that he's asserting here. And what we see in the declaration is, and this is in our brief, I think it's pages 54 onward, we walk through and engage that he says my starting knowledge was a belief or a suspicion. But this court's cases say that's not enough. You have to have some facts. Now, if you have some facts that are direct and independent, you can, of course, go and investigate further. That's not what this declaration describes. So just so that I'm clear, your position then would be that if he had somehow come into possession of a document that was able to be authenticated between Philip Morris executives that basically said, we're going to cheat the government and here's how we're doing it, et cetera, and he came into possession of that document, he couldn't be a key Tamri later because he'd still only have second-hand knowledge. It depends what the basis of his knowledge was in the first instance. I mean, to give you a concrete example, right, there was like the relator in the Quinn case who was the client, and the defendant was an arbitrator who said he arbitrated his case on a given day and billed the government. And the client said, well, I have first-hand knowledge that my arbitration did not happen that day, so he's misstating something to the government. So he had the foundation. Now, if that relator had gone on and confirmed that the arbitrator was at a resort in Bermuda and investigated that through third-party sources, that would be fine. You know, the same thing in Davis, which was akin to the situation your Honor described. So let's suppose we have what he says that he knew, and then upon his further investigation he comes into possession of a document like that. Your position would be that that document couldn't be considered because it's, in effect, second-hand knowledge? It might, Your Honor, if what he knew was a fact about the fraud he alleges, but there is nothing in his complaint or in the declaration that shows, and that's why perhaps he doesn't plead it under the Rule 11 standard. He doesn't say, I'm an original source. I have first-hand knowledge, like an insider might, that Philip Morris knew that these were comparable customers and that it was actually misrepresenting best price to the government. So it's the failure to plead that's key here? I mean, he's offered to plead it on remand, right? It's the failure to plead, Your Honor, and the futility of repleading. And I want to stress this. It's clear from our papers, and this is at Appendix 122-144, we walked through in several rounds, he's on his third complaint since 2008. He has not, he never worked for Philip Morris. He hasn't been able, he says in paragraph 30 of his complaint, he needs discovery to do what you're supposed to do at the pleading stage, which is plead some actual facts that we knew that this wasn't comparable. And the reason we'd submit it's futile, Your Honor, is that when you look on page 29 of our brief and the accompanying citations to the record, what he's admitting is that this is apples to oranges. The price disparity or the price comparison here is between Philip Morris USA charging the military one price and then Philip Morris USA charging its corporate affiliates, duty-free and international, a different price. And those are not similarly situated customers. We put SEC filings in the record that are noticeable. This is at Appendix 122 and 144 that say those are contract manufacturing arrangements, different than the government. They're not similarly situated. It explains a lot about really why there's no MFC violation here, never mind a fraud. So we respectfully submit that the court affirmed the judgment.  the research that's permissible consistent with the original source and the research that's not consistent. So it seems clear that he knew by November 2007 that there were price differentials between sales to the government for purposes of the armed forces exchanges and, quote, civilian sales. Now, maybe it's not clear. Actually, all we get clearly from the 2007 email is that there are overpayments. So the failing there is that it doesn't point to the specific things being compared or what? There's that, Your Honor, because the only specific, the Samoa Guam, came after he filed. And also, Your Honor, he's not doing what we expect an original source to do, which is point to something that's not already public. To the extent he's just saying I was aware somehow that Philip Morris was charging somebody, an affiliate or a duty-free operator, a different price in the government, that was out there for decades. So what is he adding? I mean, the disclosure bar inquiry is do you get to go forward with a key tan, despite the fact that the essential elements of your case were in the public domain? And this Court's cases say yes, if you have something substantial, material, new to add. Findley says that taking your expertise and applying a legal conclusion or supplying additional detail about an already disclosed practice is not enough. So what he doesn't have is exactly what Your Honor described, plus the building block of an original source claim, which is some personal, factual knowledge that he disclosed to the government before he filed the lawsuit. Samoa Guam is the only thing he's come up with. It doesn't work for a myriad of reasons, and it was far too late. Let's just suppose that Samoa Guam were timely. Would it be enough in your view? On the facts played here, no, because he doesn't say that he had any direct or personal knowledge of that. If he were the person buying under that arrangement, for example, or he were somehow revealing something new or material about this practice, but the practice itself, namely, his complaint and Samoa Guam rely on the same thing that has been in the public domain for decades. Namely, there's a worldwide most favorite customer policy, and then there's evidence in multiple places in the world that the military gets one price, Philip Morris corporate affiliates get another. The Iceland memo says, this is paragraph three of the memo, we frequently receive inquiries about why this is the case. It's observable on the shelf. So even with Samoa Guam, A, he had no personal direct knowledge of it, and B, it's not adding anything to what's in the public domain. It's just another example of an already disclosed practice, and that's exactly what this court's cases say is not enough to proceed as an original source after the government declines intervention. So if a custodian works at Philip Morris and they just happen to be observant and they find some documents on the desk that show government fraud and they take those to the government and the government isn't interested and then they bring a suit, they're not an original source because all their information is second-hand. I mean, they're a custodian. They don't have anything to do with procurement, et cetera, et cetera. They can read, and they read that it appears that there's fraud and they try to do something about it, but they bring this lawsuit. Your position is they're not an original source. No, Your Honor, I don't think that we have to embrace a position as broad as that to affirm the district court here. The relator in your example might be an original source. He's got something very different than the relator here, right? He's got direct firsthand knowledge of facts, documents, internal, that might otherwise go undetected. Who has his knowledge firsthand? He's not. If he were to be called as a witness in court to testify about, you know, how these transactions happened, you would object and say hearsay, and that objection, if I were sitting on the district court still, would be sustained. Possibly, Your Honor. The reason I'm hesitating is because I'm thinking of the relator in Davis who was an accountant who prepared some documents for the defendant. That relator may not have been able to testify about how the actual transactions occurred. What he could do in the first instance personally that this relator cannot is say, I have personal firsthand, my eyes knowledge of internal documents that I've read. I have the documents I can present to you. They show facts that might support a fraud. How is that different than Oliver talking to some people who have firsthand knowledge about what they were charged or weren't charged and why? Well, in the first instance, he didn't have anything but a suspicion or belief. Some of the conversations occurred too late in this case. And then, again, who's the best party to disclose it, right? When you think about what's the point of encouraging original sources or whistleblowers to come forward, in your example those documents that the custodian obtained at the defendant might never have come to light, might never have come to the government's attention. Quite different here. Mr. Oliver, as a relator, is performing no such public service. What he's doing is talking to other people who are, frankly, in a better position to speak to or report what he says is the pricing differential that shows a fraud. And so he's bringing nothing new, and he's certainly bringing nothing new that wasn't already public, which is not clear that that was the case in your hypothetical. I don't know if the facts in the documents that the relator in the hypothetical obtained were in the public domain, as is clearly the case here. Anything further? We would disrespectfully submit to the Court of Firm. Thank you. Thank you. Counsel for Appellant? Thank you. What you just heard argued was that everyone's known for decades and that it's perfectly lawful for Philip Morris to charge one price through its affiliates to private customers and one price to the government when it does it directly. That is what the Iceland memo says, and what counsel just told you was that's been known for decades, there's nothing unlawful about it, it doesn't raise any suspicion. And that is exactly why the Iceland memo doesn't give any evidence to an investigator, because all it does is confirm what you just heard Philip Morris say, everyone knows is perfectly legal. Now, more lost than ever, what did Oliver contribute? Here's what Oliver contributed, and this goes both to the public disclosure and to the original source. You have to look at what he says in his declaration, which has been a little misparaphrased by the defendant. What he says is, and this is again in paragraph, this is actually in paragraph 5. I'm sorry, in which document? This is his declaration in paragraph 5. 2005. Yes, at 451, I think it is, of the appendix. But what he says is, I met with Maloney. I asked him if my company could sell overseas. He said yes. I talked to him about pricing. Maloney told me do what everyone else does, just knock off the federal excise tax. He then says to Maloney, based upon his knowledge and experience as a market participant, no, I'm going to knock off the amounts to cover the other two surcharges. He says, this is in paragraph 5 on page 2. I told Maloney I also intended to reduce the charge to reflect two other components that I believed were inapplicable to overseas sales. And then he explains what they were. These surcharges amount to approximately $5.60 and $1.00 per carton, and in my experience in the industry, were generally passed on by cigarette manufacturers in the prices charged to the purchaser. Now, then he says, it was my understanding at the time that I was speaking with Maloney that these surcharges were not applicable to overseas sales and would not be included in overseas product pricing determinations. That's what he knows as a market participant, as someone who is involved in paying surcharges, in pricing products domestically, in pricing products overseas, and in dealing with competitive pricing. I'm sorry, it's the sentence in the first two lines of page 450 that's critical? I'm sorry, I don't... Maloney was surprised because... No, it's the end of, it's the last few lines of page, of the fourth of the previous page, where he's saying, these are the surcharges, they're passed on to the purchaser for domestic. It was my understanding, the last three lines on page two of the declaration, it was my understanding at the time, and this is page 449 of the appendix, it was my understanding at the time that I was speaking with Mr. Maloney that these surcharges were not applicable to overseas sales and therefore would not be included in the overseas pricing determinations. So the discovery of Mr. Oliver, was Oliver's original source of legal conclusion? No, it's not a legal conclusion. It's perfectly legal to include the surcharge, it's perfectly legal to do it, it's just no one was doing it. Oliver knew no one was including those amounts in the pricing. They could do it, they could have charged the private duty consumers, duty-free consumers, customers, they could have charged the government, but what they couldn't do, and what Oliver told Mr. Maloney was, they're doing it to you, they're not charging, they're not including that cost to the private sector. That is what Mr. Oliver knew based upon his market experience as someone pricing with knowledge of market pricing practices. And what he says is, it's my understanding that these amounts are not included to cover the surcharges because these surcharges only apply to domestic sales. You're saying that he knew what the industry practice was and that Philip Morris wasn't complying with the industry practice as far as pricing. Well, he knew what the industry practice was because he himself was a market participant. And what he was saying was, Philip Morris complied with the industry practice with the private duty-free customers and was not complying with the industry practice, which he didn't have to do, but he couldn't treat them differently. What he was saying was, look, you're being charged an extra $660,000 that is not being included in the pricing to the duty-free market. Okay, let's go back. Okay. There's a problem. We've set this in all its glory. Mr. Maloney, the buyer for Nexcom, didn't know about the price differential. Correct. He's been happily paying the higher price. Correct. And what Oliver reveals to him is that civilian buyers are getting a much better deal. Correct. Is that it? Yes. And now that, as Bethesda said, that the Iceland memo reflects awareness of that as being very widespread. I agree with that. Accept that. Accept the Iceland memo says this is a perfectly legitimate thing, and what Mr. Oliver adds is if they are doing this because they're telling the government that we need to include amounts to cover the surcharges, that is fraudulent because those surcharges don't apply, and the amounts to cover the surcharges are not charged to the private duty sector, duty-free sector. That is what prompts Mr. Maloney to say, wow, they've been pulling the wool over my eyes. Maloney knows what the price is domestically. Nexcom buys domestically and overseas. Maloney knows I'm paying, and I'm making this number up, $15 for a carton, and Philip Morris has told Nexcom that part of that is an amount to cover the surcharge for the MSA and the surcharge for the TTPP, and Maloney accepts that. Now Philip Morris comes and says we're going to charge the same $15 overseas, including those same amounts to cover the surcharges. Oliver comes along and says, whoa, there's no amount to cover the surcharges because those are domestic, and when Philip Morris prices the private sector overseas, it knocks those numbers out. So the private sector is paying $10 instead of $15 for the same cigarette. Maloney says, wow, they've been pulling the wool over my eyes. The Iceland memo doesn't address that at all. All the Iceland memo says is there's different prices. It could be completely legal. It could be somebody made a mistake. It could be fraud. But there's nothing in the Iceland memo that says this is a deliberate way to include $6.60 for surcharges to cover purported surcharges that we don't charge in the private sector. And that is why the difference between the complaint in this action and the Iceland memo, and with all due respect to the characterization of the complaint, here is what the complaint alleges. The complaint alleges in paragraph 31, not 25 through 29, but paragraph 31, that Philip Morris falsely warranted compliance with the MFC provisions when it knew it was not complying. The complaint alleges in paragraph 32 that Philip Morris made those false statements to get money it was not entitled to get. The complaint alleges in paragraph 39 that Philip Morris used these false presented and used false statements to make a fraudulent claim, to get a fraudulent claim paid. And the complaint alleges in paragraphs 25 through 29 a scheme. The scheme was we are going to sell directly to the military at one price. We're going to use our affiliates to sell to the private sector at a lower price. And the complaint alleges that they did that knowing that there was no, just the complaint alleges it's identical cigarettes. The claim alleges it's similar markets. The complaint alleges this was a scheme. This wasn't something perfectly legal for two decades or three decades. This is something, by the way, the MSA didn't come into effect until the late 90s. This is something that was done by Philip Morris, the complaint alleges, to circumvent its requirements under the MSC's. Judge Williams, any further questions? I have one last point if I might add. That is simply the pleading issue. What, if you were required to plead original source? You don't, this is not something you're. That's addressed in your brief. Okay, it is. And I rest on that. All right. Thank you very much. Thank you. We'll take the case under advisement.
judges: Rogers, Wilkins, Williams